UNITED STATES of America

v.

Leonard A. PELULLO, Appellant.

No. 91–1792.

United States Court of Appeals,
Third Circuit.

Argued April 7, 1992.

Decided May 12, 1992.

As Amended May 18, 1992.

Rehearing Denied July 27, 1992.

John W. Nields, Jr., W. Neil Eggleston (argued), Richard A. Ripley, Diane B. Heller, Howrey & Simon, Washington, D.C., for appellant.

Michael M. Baylson, U.S. Atty., Joel M. Friedman, Ronald G. Cole (argued), Frank A. Labor, III, Asst. U.S. Attys., Organized Crime Strike Force, Philadelphia, Pa., for appellee.

Before: GREENBERG and SCIRICA, Circuit Judges, and DEBEVOISE, District Judge [*].

---

* Honorable Dickinson R. Debevoise, United States District Judge for the District of New Jersey, sitting by designation.

## OPINION OF THE COURT

GREENBERG, Circuit Judge:

Leonard A. Pelullo appeals from a judgment of conviction entered in the United States District Court for the Eastern District of Pennsylvania following a three-week jury trial. The jury convicted Pelullo of 49 counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of racketeering under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and 1963. He was, however, acquitted of five additional counts of wire fraud. On August 30, 1991, Pelullo was sentenced to a term of 24 years' imprisonment, assessed $4,400,000 in fines, and ordered to pay restitution of $2,071,000 and $114,000.

On appeal, Pelullo argues that the district court erred in: (1) failing to conduct an adequate charge conference under Fed.R.Crim.P. 30; (2) charging RICO's "pattern of racketeering activity" and "enterprise" elements; (3) charging on the wire fraud counts as the charge permitted the jury to convict Pelullo for violating his civil fiduciary duties; (4) ruling on the statute of limitations defense to the wire fraud counts; (5) admitting inadmissible bank documents without proper foundation in evidence; (6) admitting inadmissible summaries under Fed.R.Evid. 1006; (7) preventing him from attacking the credibility of government witnesses in summation; and (8) admitting crucial hearsay testimony of an informant, Philip Leonetti.

We find that the court permitted a substantial amount of hearsay in the form of bank documents and summaries prepared by an FBI agent, Randall Wolverton, to be admitted at trial even though the Government failed to satisfy any of the hearsay exceptions justifying its admission. Because we cannot conclude that the admission of this evidence was harmless, we will reverse the judgment of conviction and remand for a new trial on all counts except count 54, a mail fraud count, on which we

are satisfied that any error was harmless. We also conclude that the court erred in charging the jury under RICO with respect to the "pattern of racketeering activity" and "enterprise." Although these errors as well as other errors in other matters which we also consider either may have been or were harmless, since the issues involved are likely to resurface on remand we will address them as well. Of course, we also consider the statute of limitations issues, as a ruling on that point in favor of Pelullo could bar a retrial on the wire fraud counts.

## I.

### BACKGROUND [1]

We set forth the evidence at length as this is required for an understanding of this case, our description being from a view of the evidence in a light favorable to the Government as the verdict winner. The indictment charged Pelullo with engaging in a pattern of illegal racketeering activity by abusing his position as chief executive officer of The Royale Group, Limited ("Royale"), a publicly held corporation. In the fall of 1983, Royale, through wholly owned subsidiaries, acquired six "art deco" hotels in Miami Beach, Florida: the Cardozo, the Victor, the Senator, the Leslie, the Carlyle and the Cavalier. In June 1984 the hotels obtained a $13.5 million loan from FCA Mortgage Corporation ("FCA Mortgage"), a wholly owned subsidiary of American Savings and Loan Association ("American"). Approximately $10 million of the loan was earmarked for acquisition costs, while the remaining $3.5 million was to be used for renovation. The loan was increased twice, by $2.2 million in January 1985 and $1.4 million in September 1985. By September 1985, $6.2 million of the loan proceeds was to be used for renovation. Under the agreement, American retained this portion of the loan and would disburse funds as the renovation costs were incurred. To obtain a disbursement, Royale

1. This case was video-taped under an experimental program; thus, our references to the trial are to the video-tapes. But the parties obtained a transcript of the trial which we have also examined. We have relied for our understanding of the proceedings on the video-tape which in some instances immaterially varies from the transcript.

was required to submit draw requests setting forth a certified itemization of these costs.

The indictment charged Pelullo with three fraudulent schemes. First, the Government alleged that Pelullo defrauded American, Royale and Royale's shareholders of approximately $1.6 million by submitting false documentation in connection with certain draw requests on the project. This scheme is reflected in wire fraud counts 1 through 53 and racketeering acts 1 through 59 of count 55, the RICO count, which referred to the same transfers as those in the wire fraud counts, as well as several additional transfers. The second scheme, reflected in wire fraud count 54 and RICO racketeering act 60, involved Pelullo's defrauding Royale of $114,000 in February 1986 by diverting cash from one of its subsidiaries to repay a debt Pelullo owed to a loanshark connected with the Philadelphia mafia. The third scheme, which is reflected only in racketeering acts 61–72, and not in individual wire fraud counts, charged Pelullo with defrauding Royale of approximately $500,000 by diverting money for uses other than the purposes of the loans that American had loaned to Royale.

Under the terms of the loan Royale was permitted to draw loan money to pay for so-called "hard costs" associated with the renovation work, such as labor, materials and supplies. Pelullo, who certified most of the draw requests, overstated the renovation costs and submitted false documentation upon which American relied to support these costs.

Pelullo directed the bank to transfer the disbursements by wire transfers to Delta Development and Construction Corporation ("Delta"), a company owned and controlled by Pelullo or his family, which acted as general contractor for the renovation project. He thereupon diverted the proceeds for his personal use through various corporations he owned and controlled. Some of the proceeds were used to purchase or run two farms in Chester County, Pennsylvania; to purchase a sheep ranch in Montana; for operating corporations set up

to run restaurants in the Philadelphia area; and to repay a loan on behalf of his father. In addition, $100,000 of the loan was converted to cash and delivered to Pelullo at a casino in Puerto Rico.

Pelullo's intentional failure to disclose to Royale's board of directors information pertaining to the use of the loan proceeds was a significant theme throughout the Government's case. The Government introduced evidence that Pelullo failed to maintain adequate financial records of the renovation costs and disbursements, withheld financial records from Royale's independent auditors, and delayed filing financial disclosure reports required by the Securities and Exchange Act of 1934. The Government maintained that, if Royale had kept proper accounting records, the Royale board and its shareholders would have known exactly how Pelullo was using its money.

For example, the evidence showed that Pelullo prevented Royale's outside auditors from viewing bank records of Delta and other related corporations. When Touche Ross & Company, Royale's public accountants, advised Pelullo that it could not certify Royale's financial statements without these records, Pelullo fired Touche Ross. Coopers & Lybrand replaced Touche Ross, but then withdrew from Royale's audit after Pelullo similarly refused to disclose documents relating to the renovation costs for the hotels.

Additionally, several witnesses testified regarding Pelullo's failure to act in accordance with his responsibilities as a corporate officer. One, Professor John C. Coffee, Jr., testified as to the fiduciary duties imposed on corporate officers by state corporation law and federal securities law.

Agent Wolverton's testimony was very significant in establishing that there were fraudulent wire transfers. He traced Pelullo's diversion of funds by an analysis of subpoenaed bank records of Royale, Delta and other Pelullo-controlled companies. His analysis was also based on numerous interviews he conducted over the course of his investigation. Wolverton concluded that Pelullo diverted loan proceeds of

$1,603,894.71 through the first scheme and $471,500 through the third scheme. The first scheme related to loan proceeds earmarked for "hard costs," *i.e.* actual renovation work, while the third scheme related to "soft costs," *i.e.* overhead and administrative expenses. Agent Wolverton prepared summaries of the diversions, which were admitted as Government exhibits over Pelullo's objections.

The evidence with respect to the second scheme showed that Pelullo obtained a personal loan from one Anthony DiSalvo. When Pelullo failed to repay the loan, DiSalvo sought the assistance of Philip Leonetti and Nicodemo Scarfo, respectively the underboss and boss of the Philadelphia mafia. After meeting with Leonetti and Scarfo, Pelullo diverted $114,000 from a bank account of Palm Beach Heights Development Corporation ("PBH"), another Royale wholly owned subsidiary. The funds were then wired to a corporation in Philadelphia and, on February 25, 1986, were converted to cash and delivered to DiSalvo. Leonetti, a government informant, testified that Pelullo paid $90,000 in cash to DiSalvo around the time of the $114,000 wire transfer. At trial, Pelullo did not dispute the existence of the debt, but testified that he repaid it by mortgaging real estate that he owned. Pelullo's father, Peter Pelullo, Sr., who received the wire transfer and who served as job supervisor for the renovation project, testified that the $114,000 constituted a partial payment for his work on the hotel project.

## II.

## ADMISSION OF BANK DOCUMENTS AND SUMMARIES

■ To the extent the district court's admission of evidence was based on an interpretation of the Federal Rules of Evidence, our standard of review is plenary. But we review the court's decision to admit the evidence if premised on a permissible

view of the law for an abuse of discretion. *United States v. Furst,* 886 F.2d 558, 571 (3d Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990).

### A. The Bank Documents

■ At trial, Wolverton, who is a certified public accountant, described how he traced funds diverted by Pelullo, by examining subpoenaed wire transfer documents, statements and checks. Wolverton testified that wire transfer documents are bank-generated documents that record the date, amount and source and destination account numbers of each wire transfer. The court admitted these documents over Pelullo's objections that the evidence was hearsay.

The documents were hearsay. Each was an out-of-court statement offered to prove the truth of the facts described in the document, such as the identity of the sender and recipient, and the amount of the transaction.[2] *Cf. United States v. Hathaway,* 798 F.2d 902, 905–08 (6th Cir.1986) (in mail and wire fraud prosecution arising out of fraudulent investment schemes, transaction statements, trade tickets, advertising materials, cancelled checks, client files, correspondence and client account agreements were only admissible because these documents were not offered for truth of the matters asserted therein but were offered to prove defendant's possession of the documents).

■ The Government makes a litany of arguments in support of the admissibility of the documents. Initially, it contends that the documents were not hearsay since, as records of corporations controlled by Pelullo, they constituted admissions. However, while the documents purport to record transactions of Pelullo-controlled companies, the testimony shows that these were bank records and not records made by Pelullo or corporations controlled by him. Additionally, there is nothing in the record to indicate that Pelullo directed or autho-

---

**2.** While it is possible that in some circumstances the documents could have been admitted, inasmuch as the Government had to prove the specifics of the transactions in order to prove the

wire fraud and racketeering counts it is clear that the documents were offered to prove the truth of the facts asserted in those documents.

rized the creation of any of the documents.[3] Thus, the documents cannot be admissions since they are not attributable to Pelullo or to corporations controlled by him.

■ At oral argument before us the Government argued that the documents were adoptive admissions since they were sent to Pelullo and he failed to deny their accuracy. *See* Fed.R.Evid. 801(d)(2)(B). Again, however, there is nothing in the record that establishes this significant fact. In fact, the record shows the contrary. Following Pelullo's hearsay objections, Mr. Cole (the Assistant United States Attorney) elicited the following from Agent Wolverton on direct examination:

> Q: Just for the record, [these are] government exhibits 15 through 84, government exhibit 87 and government exhibit 161. Would you tell the jury what these documents are and how they tie into your schedules:
>
> A: These relate to each of the wire transfers that are on my schedules and they will show records concerning the receipt of the money and what happened to the money when it was traced out of the accounts....
>
> Q: Are they all bank documents?
>
> A: Yes.

> Q: And were they all—how were they all obtained?
>
> A: Through the use of grand jury subpoenas.
>
> Q: *To banks?*
>
> A: *Yes.*

6/26/91, 10:01:56–10:02:42 (emphasis added).[4]

■ Additionally, the government argues that, even if the documents were hearsay, they were admissible under the business records exception to the hearsay rule. Fed.R.Evid. 803(6). The business records exception permits admission of documents containing hearsay provided foundation testimony is made by "the custodian or other qualified witness," that: (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business. *Furst*, 886 F.2d at 571; Fed.R.Evid. 803(6).[5] With the exception of certain documents relating to counts 7, 11, 14, 49 and 54 (racketeering acts 10, 14, 17, 55 and 60), however, no such foundation was ever laid for their admission.[6]

**3.** For purposes of this analysis, we will assume that a statement made by a corporation owned and/or controlled by Pelullo may be considered an admission of Pelullo in a criminal prosecution. *See* n. 4, *infra.*

**4.** We decline to consider *sua sponte* whether the documents were authorized admissions under Fed.R.Evid. 801(d)(2)(C). First, the Government has never urged this as a theory of admissibility. Second, this provision requires independent proof of the existence of an agency relationship and its scope. *See In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 238, 300 (3d Cir.1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Even if we could take judicial notice of the fact that banks are generally authorized to issue certain documents on behalf of their customers, we would decline to do so in this case. The documents at issue here came from some 18 different banks and relate to numerous entities; there are simply too many factual issues that would need to be resolved to satisfy Rule 801(d)(2)(C). These are matters that should be resolved by the trial court in the first instance in

the event the Government seeks to rely on this provision upon remand.

**5.** Rule 803(6) in pertinent part provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> ....
>
> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

**6.** Pelullo admits that some witnesses who testified had personal knowledge of the documenta-

The Government, citing *Furst*, 886 F.2d at 572, and *Hathaway*, 798 F.2d at 905–07, contends that the documents could have been admitted even without testimony of a custodian since surrounding circumstances provided the necessary foundation for trustworthiness. Here, the Government maintains that there are sufficient circumstantial guarantees of trustworthiness since: (1) the records were obtained in response to grand jury subpoenas directed to the corporations and their banks; (2) testimony of witnesses involved in the transactions corroborated the information in the bank records; and (3) Pelullo has not stated any reason why the records are not reliable. However, these reasons are not sufficient to overcome the express requirements of Rule 803(6).

■ It is, of course, true that Rule 803(6) does not require foundation testimony from the custodian of records for the rule states that such testimony may be provided by either the custodian or "other qualified witness." Furthermore, "[t]he phrase 'other qualified witness' should be given the broadest interpretation; he need not be an employee of the entity so long as he understands the system." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(6) [02], at 803–178 (footnote omitted) (hereinafter "Weinstein & Berger"). Thus, courts have held that a government agent may provide a foundation where the agent is familiar with the record-keeping system. *See, e.g., United States v. Franco*, 874 F.2d 1136, 1139–40 (7th Cir.1989); *see also Hathaway*, 798 F.2d at 906 ("there is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent"). In *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 288 (3d Cir.1983), *rev'd on other grounds sub. nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), we approved of the district court's holding that:

'the testimony of the custodian or other qualified witness is not a sine qua non of admissibility in the occasional case *where the requirements for qualification as a business record can be met* by documentary evidence, affidavits, or admissions of the parties, *i.e.*, by circumstantial evidence, or by a combination of direct and circumstantial evidence.'

*Id.* (quoting *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F.Supp. 1190, 1236 (E.D.Pa.1980)) (emphasis added).

However, none of these authorities holds that the court may admit into evidence under the business exception to the hearsay rule documents containing hearsay simply because there are some indicia of the trustworthiness of the statements.[7] While a noncustodial witness such as a government agent, or even documentary evidence, may be used to lay the foundation required by Rule 803(6), that witness or those documents must still demonstrate that the records were made contemporaneously with the act the documents purport to record by someone with knowledge of the subject matter, that they were made in the regular course of business, and that such records were regularly kept by the business. *Cf. Franco*, 874 F.2d at 1140 (agent gave thorough description of the manner in which records were prepared and maintained based on agent's conversations with owner and employee of business as well as agent's own observations); *Hathaway*, 798 F.2d at 906 (FBI agent permitted to lay foundation where agent had familiarity with the record-keeping system). *But see United States v. Hines*, 564 F.2d 925, 928 (10th Cir.1977) (automobile manufacturers' invoices admissible without foundation since such documents possess a high degree of trustworthiness and necessity of admitting them outweighs inconvenience in having custodian testify), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770 (1978). Here, Agent Wolverton did not purport to have familiarity with the record-

---

tion supporting the wire transfers alleged in counts 7, 11, 14, 49 and 54. *See* Pelullo's Brief at 37 n. 23. We address these counts in Section II.C. below.

7. Such an interpretation would limit the significance of the residual hearsay exception of Rule 803(24), a provision we address below.

keeping system of the banks, nor did he attest to any of the other requirements of Rule 803(6). Therefore, as proponent of the evidence, the Government failed to lay a proper foundation as required by the business records exception.

■ Alternatively, the Government argues that the documents were admissible under Rule 803(24), the residual hearsay exception. That provision creates a general exception to the inadmissibility of hearsay where there are adequate "circumstantial guarantees of trustworthiness...." Fed.R.Evid. 803(24). But Rule 803(24) is subject to the following proviso: "However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including name and address of declarant." *Id.* If notice is given, the statement(s) may be admitted where there are:

> equivalent circumstantial guarantees of trustworthiness [to the other hearsay exceptions], if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 803(24).

■ Bank documents like other business records provide circumstantial guarantees of trustworthiness because the banks and their customers rely on their accuracy in the course of their business. In fact, in the context of discussing the foundation requirements of the business records exception, one leading authority has noted that "[a] foundation for admissibility may at times be predicated on judicial notice of the nature of the business and the nature of the records as observed by the court, *particularly in the case of bank and sim-*

*ilar statements."* 4 Weinstein & Berger ¶ 803(6) [02], at 803–178 (emphasis added) (footnote omitted); *see also Karme v. Commissioner,* 673 F.2d 1062, 1064–65 (9th Cir.1982) (bank records provided pursuant to treaty admissible under Rule 803(24) given circumstantial guarantees of trustworthiness even though inadmissible as business records because there was no foundation testimony). Nevertheless, the residual hearsay exception may not be used as a substitute for the business records exception when counsel has not complied with the requirements of 803(6) unless the requirements of Rule 803(24) have been met. *Cf. In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d at 302 (courts may consider admissibility of documents under Rule 803(24) despite having failed the requirements of another exception; rejecting "near miss" theory).

The Government, in an attempt to satisfy the notice requirement, argues that the documents were made available to Pelullo months before trial. Although Rule 803(24) may be read as requiring only that the proponent give notice of the hearsay *statement* (and its particulars, including the name and address of the declarant), in *Furst* we construed the notice provision to require the proponent to give notice of its intention specifically to rely on the rule as grounds for admissibility. *See Furst,* 886 F.2d at 574. *See also United States v. Tafollo–Cardenas,* 897 F.2d 976, 980 (9th Cir.1990) (prosecutor must give notice of Rule 803(24) as basis for admissibility); *but see United States v. Benavente Gomez,* 921 F.2d 378, 384 (1st Cir.1990) (requiring that notice be given of the existence of the evidence). At oral argument, the Government conceded that it did not notify Pelullo that it intended to rely on the residual exception to the hearsay rule for admission of the documents. Therefore, under *Furst,* it may not rely on Rule 803(24) as a basis for admissibility.

In addition, because the Government first made the "residual exception" argument on appeal, the district court did not make any findings regarding the statements' or documents' admissibility under

Rule 803(24), and perhaps we should not consider their admissibility for this reason alone. *See, e.g. Tafollo–Cardenas,* 897 F.2d at 980 (prosecutor must either state the exception as grounds for the admissibility or district court must find that the statement met requirements of the rule in order for appellate court to consider admissibility of statement under 803(24)); *but cf. United States v. Nivica,* 887 F.2d 1110, 1127 (1st Cir.1989) ("If the trier incorrectly admits evidence under a hearsay exception, we will not reverse so long as the material was properly admissible for the same purpose under a different rule of evidence"), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). While the reasoning of *Nivica* may be preferable where it is clear that the district court's error in admitting evidence was harmless, we are unwilling to dispense in this case with the requirement of notice expressly provided for in Rule 803(24). Additionally, Rule 803(24) requires that the court make factual findings and the district court is in a better position to make these findings in the first instance, such as that the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts. *See* 4 Weinstein & Berger ¶ 803(24) [01], at 803–373–79. Furthermore, although the court of appeals in *Nivica* relied on Rule 803(24) where the district court erroneously relied on Rule 803(6) to admit certain bank records, the district court in that case made express findings that the documents were authentic, reliable and trustworthy and that, given the provenance and character of the materials, their admission was justified. *See* 887 F.2d at 1127. The district court did not make such findings here. Accordingly, Rule 803(24) does not support the Government's position.

Much has been made by the Government of the inherent trustworthiness of the documents at issue in this case. It has repeatedly stressed that these documents are nothing more than ordinary bank statements and the like, obtained by subpoena. We recognize that the Government relied on not a few but many such documents in presenting its case, and we are not unmindful of the purposes of the Federal Rules of Evidence, as stated in Rule 102:

> These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

■ Moreover, we recognize that, given Pelullo's theory of defense, the policies underlying the hearsay rule may have been only marginally implicated by the admission of these documents. The hearsay rule provides that an out-of-court statement cannot be admitted for the truth of the matter asserted since the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined. The documents at issue here were admitted to prove that transfers of funds were made to individuals and entities in specific amounts. As indicated above, they are out-of-court statements by a declarant that the transactions took place in the manner described by the documents, which is what they were offered to prove. At trial, however, Pelullo's defense was not predicated on a denial that the transactions had occurred in the manner described, though he preserved his objection to the admissibility of the evidence, but rather that the transfers were not fraudulent at all. Thus, considering the trustworthiness of the documents and Pelullo's theory of his case, we are tempted to question whether Pelullo has been prejudiced by the admission of these documents.

In the final analysis, however, an accused is under no duty to rebut bare allegations by the prosecutor that documents are what they purport to be and establish the truth of what they represent. *Cf.* Fed. R.Evid. 901 (dealing with requirements for authentication or identification). Business records are not self-proving documents as public records may be. *See* Fed.R.Evid. 803(8). In our view, the goals underlying the Federal Rules of Evidence would not be

furthered by upholding the admissibility of these documents as the record now stands, since to do so we would necessarily eviscerate the requirements of Rules 803(6) and 803(24). Although the Federal Rules of Evidence are to be liberally construed in favor of admissibility, this does not mean that we may ignore requirements of specific provisions merely because we view the proferred evidence as trustworthy. We thus conclude that the documents constitute hearsay, that they were not admissible under the business records exception since a proper foundation for them was not laid, that the residual hearsay exception was inapplicable since the Government did not give Pelullo notice of its intention to rely on Rule 803(24) and the district court did not make the findings as required by that rule, and that the documents were not admissible under any other exception or exclusion to Rule 801's prohibition of hearsay.

■■■ In view of the critical importance of this evidence we cannot conclude that the error was harmless, except with respect to counts 7, 11, 14, 49 and 54, which Pelullo concedes were verified through admissible testimony. *See* n. 6, *supra.* Indeed, the Government itself concedes that "the bank records were material ... [and that] [t]he government had no other evidence to complete the tracing process showing the movement of funds from American and PBH to appellant." Government's Brief at 41. Accordingly, except for the five foregoing counts, it was reversible error to admit the documents.

### B. Summaries

■■■ Inasmuch as admission of the bank documents was harmless error as to counts 7, 11, 14, 49 and 54, we next consider an additional evidentiary problem. Through an analysis of the bank records discussed above, as well as through numerous field investigations, Agent Wolverton determined that Pelullo had diverted $2.2 million in loan proceeds for his personal use. Wolverton testified that his analysis was based in part on "interview[s] of those people [who received a check] ... to confirm

whether or not they were actually doing work on the art deco hotels." Wolverton summarized his analysis of each diversion on schedules, which were used at trial to aid in his testimony. Over Pelullo's objections, the district court admitted the schedules as summaries pursuant to Fed.R.Evid. 1006. Pelullo argues that the summaries should not have been admitted since they were based on inadmissible hearsay. We agree.

Rule 1006 provides:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

It is well established that summary evidence is admissible under Rule 1006 only if the underlying materials upon which the summary is based are admissible. *AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.,* 896 F.2d 1035, 1045 (7th Cir.1990); *United States v. Meyers,* 847 F.2d 1408, 1412 (9th Cir.1988); *State Office Systems, Inc. v. Olivetti Corp. of Am.,* 762 F.2d 843, 845 (10th Cir.1985); *Hackett v. Housing Auth. of San Antonio,* 750 F.2d 1308, 1312 (5th Cir.), *cert. denied,* 474 U.S. 850, 106 S.Ct. 146, 88 L.Ed.2d 121 (1985); *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1259 (9th Cir.1984); *United States v. Johnson,* 594 F.2d 1253, 1255–57 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 376 (1979); *see also* 5 Weinstein & Berger ¶ 1006[03], at 1006–7. Inasmuch as we have found that the bank documents were inadmissible, it follows that the schedules must fail as well.

Moreover, the summaries were inadmissible because they were based in part on Wolverton's out-of-court interviews. The Government argues that this cannot be so: "[Pelullo's] argument proposes an absurd rule of evidence. If correct, law enforcement officers investigating financial crimes would be competent to testify only if they

participated in the fraud, and therefore had personal knowledge of the transactions." Government's Brief at 42–43. Of course, law enforcement officers are not bound by the Federal Rules of Evidence in conducting their investigations. However, they are bound by rules of evidence when they take the witness stand. It would be difficult to imagine a clearer example of hearsay than if Wolverton had testified at trial that he had a conversation with a vendor who told him that he or she did not work on the art deco renovation project. The third-party statement would be offered by the Government to prove the truth of the matter asserted, *i.e.* that the individual or vendor did not work on the project.[8] Thus, Wolverton's schedules were not so much summaries of admissible evidence as they were his conclusions which were based on both admissible and inadmissible evidence.[9] Therefore, the schedules are inadmissible not because Wolverton merely interviewed people during the course of his investigation, but because the schedules were predicated upon inadmissible evidence. Rule 1006 does not permit such a result.[10]

At oral argument, the Government contended that the schedules were prepared entirely from evidence that was admitted at trial, and that no information was included on the schedules as a result of third-party interviews. Rather, the Government asserts that Agent Wolverton relied upon hearsay to take information *off* the schedules. Therefore, the government asserts that the interviews were conducted for Pelullo's *benefit*.[11]

8. We reject the Government's assertion at oral argument that the third-party statements were merely "confirmations of a physical act." Initially, we note that almost all evidence may be viewed, in one way or another, as a "confirmation of a physical act," (except, perhaps, evidence pertaining to a person's state of mind). In certain instances, "[w]hen non-verbal conduct, like the transfer of money, is ambiguous, contemporaneous words which characterize the transactions are not hearsay under Fed.R.Evid. 801." *United States v. Valentine,* 644 F.Supp. 818, 821 (S.D.N.Y.1986), *rev'd on other grounds,* 820 F.2d 565 (2d Cir.1987). However, "[t]his situation must be differentiated from the case where words which clarify an ambiguous situation are relevant only because they are offered for their truth." 4 Weinstein & Berger ¶ 801(c)[01], at 801–93–94 (footnote omitted). The documents at issue here do more than "characterize" the transactions, such as being a gift or a loan, but rather define the transactions themselves by identifying the sender, recipient, amount, etc. These facts are what the Government sought to prove by introducing the documents, *i.e.,* they are "relevant only because they are offered for their truth."

In passing, we also note the numerous theories that the Government has advanced at trial, in its appellate brief and in oral argument regarding the admissibility of these documents, to wit, that they were admissible as: (1) adoptive admissions; (2) verbal acts; (3) confirmations of a physical act; (4) evidence of a crime; (5) business records; (6) residual hearsay; and (7) properly authenticated pursuant to Fed.R.Evid. 901. We further note that the summaries are not admissible under the public records exception codified at Rule 803(8).

9. The schedules were not pedagogical devices used to summarize or organize testimony or documents that have been admitted in evidence.

*See* 5 Weinstein & Berger ¶ 1006[07], at 1006–15. Rather, a portion of the schedules reflected Agent Wolverton's conclusions that were based in part on information not admitted during trial.

10. The Government's reliance on *United States v. Paxton,* 403 F.2d 631 (3d Cir.1968), *cert. denied,* 393 U.S. 1082, 89 S.Ct. 863, 21 L.Ed.2d 775 (1969), is misplaced. *Paxton* did not involve the admissibility of summary evidence and was decided prior to enactment of the Federal Rules of Evidence.

11. The following colloquy took place during oral argument:

THE COURT: What about the analysis based on reports which [Agent Wolverton] had gotten from various ... vendors ...?

Mr. COLE: If you look at the record—Agent Wolverton's testimony carefully you will see that the testimony that he gave on the preparation of these schedules and the role that these other people played in the field investigations meant that it served ... that it was done for the defendant's benefit, not to his detriment. Let me explain how they were constructed. [The schedules were] based on an examination of the records themselves, the physical records that were available to him: wire transfers, canceled checks, bank statements and the defendant's corporate records.... The actual schedule is prepared on the basis of physical documents, nothing whatsoever to do with what somebody else said. You simply look at a check, if it's made payable to John Doe and based on the agent's analysis of the records John Doe had nothing to do with the construction project, the renovation project of the hotels, that went on the diversion list. Now, let's say, for example, to

However, this argument is not supported by the record. While Agent Wolverton's testimony reveals that he relied on numerous sources (many of which we have concluded above were not properly admitted), we cannot ignore his direct testimony regarding the purpose of the interviews in preparing the schedules:

Q: Now, what I want you to do, Agent Wolverton, first of all tell the jury what those documents are?

A: One document ... is a summary schedule that I prepared that I've entitled diversions for Royale Group Limited, and the second document I prepared is a summary schedule of diversions for Delta Development and Construction.

. . . .

Q: Now, I want you to take the jury from your construction cost schedules and your analysis of the checking account information to that—those two schedules.

A: From the analysis of the check account schedules, I would see a disbursement that appeared to be related to the personal use of the defendant or for his benefit, I would record that transaction on these schedules.

Q: Okay. Now, I want you to tell the jury what today as you have those schedules before you, *what information you used to compile these schedules?*

A: Well, I was present during this courtroom session and I heard testimony from other witnesses. I interviewed Mr. Pelullo. I had other records available to me at that time where I could independently look at the records, *and we conducted independent investigations.*

Q: *And in what way did you conduct independent investigations?*

A: *On most, if not all of the transactions where people actually received a check, we would go interview those people.*

Q: *And what was the purpose of that interview?*

A: *To confirm whether or not they were actually doing work on the art deco hotels.*

Q: Okay. *And as a result of all of the information including* your presence here in this courtroom throughout this trial, the documents you had available to you and *your independent investigations, are these schedules the result of your—of that information and documents?*

A: *Yes.*

7/26/91, 9:46:01–9:47:10 (emphasis added).[12]

In light of this testimony, we simply cannot conclude that the interviews were used solely as a basis for removing items from the schedules that, prior to the interview, were erroneously believed to be diversions.

be abundantly sure that it was properly on there—and at that point he had to do nothing further—but just to make sure he went to John Doe and he said, 'John Doe, did you do anything for the art deco project?' and John Doe said 'no,' it stayed on the schedules.
THE COURT: But what if he said yes?
Mr. COLE: It went off, and that went to the defendant's benefit.
THE COURT: But suppose [he] said neither yes nor no, how do you know that just because it went there it was a diversion?
Mr. COLE: Because other people testified, Your Honor, as to the purpose of those disbursements. Other people, we had live witnesses. We didn't rely just on Agent Wolverton's testimony.... There were numerous witnesses who testified as to the substantive nature of the disbursements themselves....
THE COURT: So then what you're saying is every situation where what would otherwise be hearsay by Agent Wolverton was supported by other admissible testimony?

Mr. COLE: Yes sir, but I emphasize that Agent Wolverton did not rely on hearsay in constructing the schedule. He relied on hearsay to take something off the schedule....

**12.** At this point, counsel for Pelullo objected on the ground that "[t]he witness has just testified that this answer is given based upon hearsay, interview of witnesses outside of the courtroom and persons based on his investigations, [and] other documents...." The Government replied:

It's an entirely proper summary, your Honor. It is for the jury to determine whether those items on that list are on there properly. This is merely a summary for the jury's purpose and that alone. It is not—his opinion is not the issue here. It doesn't matter what he thinks. It's a compilation based on the things that I have disclosed through the questioning of this witness.
7/26/91, 9:47:10.

## C. Counts 7, 11, 14, 49 and 54

The Government has established through admissible testimony that the transactions reflected in counts 7, 11, 14, 49 and 54 (racketeering acts 10, 14, 17, 55 and 60) took place, and thus the hearsay problem as discussed in Section A above has been overcome as to those counts. However, because the jury could have concluded that these transactions were fraudulent based on Agent Wolverton's inadmissible summary schedules, we must reverse as to these counts as well, with the exception of count 54. Of course, inasmuch as RICO count 55 was based on the transactions in the wire fraud counts, as well as some additional wire transfers similarly infected, the RICO conviction also must be reversed. But count 54, relating to the $114,000 transaction from Palm Beach Heights Development Corporation, was clearly established by admissible evidence independent from the documents discussed in Section A. Furthermore, under our view of the record, Agent Wolverton's schedules did not relate to the $114,000 diversion which in any event was clearly proven by competent evidence. Accordingly, we will not disturb the conviction on this count. While we realize that there may be a danger in isolating a particular count for a harmless error analysis when there was so much inadmissible evidence on other counts, we are satisfied that no such danger exists here as count 54 embraced a scheme quite separate from the schemes in the other counts. We note, however, that if Pelullo is not retried or if he is retried and acquitted on one or more of the retried counts, he may be resentenced on count 54. *See United States v. Salamone,* 869 F.2d 221, 234 (3d Cir.1989), *vacated on other grounds,* 493 U.S. 1038, 110 S.Ct. 830, 107 L.Ed.2d 826 (1990).

Although we conclude that the admission of the bank records and summary schedules was reversible error, we will address Pelullo's remaining contentions inasmuch as these issues are likely to arise again on

remand in the event of a retrial and, to a limited degree, the contentions relate to count 54.

## III.

## THE JURY CHARGE

### A. The Continuity Element of the Court's "Pattern" Instruction

■ Pelullo argues that the court's instruction defining "a pattern of racketeering activity" is at odds with the Supreme Court's decision in *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), because it did not adequately apprise the jury of the "continuity" element.[13] Pelullo was convicted under 18 U.S.C. § 1962(c), which provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Section 1961(5) provides that " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." In *H.J. Inc.* the Supreme Court held that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." 492 U.S. at 239, 109 S.Ct. at 2900 (emphasis in original).

■ Predicate acts are related if the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.,* 492 U.S. at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C.

---

13. Although the Government maintains that Pelullo failed to make a specific objection to this instruction, since we must reverse on other grounds we need not address this contention.

Inasmuch as we are reversing the RICO count for evidentiary reasons our discussion on the RICO charge point is plenary.

§ 3575(e)). The continuity element must be determined on a case-by-case basis. *Id.*, 492 U.S. at 241, 109 S.Ct. at 2902. The Supreme Court in *H.J. Inc.* described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* "It is, in either case, centrally a temporal concept. . . ." *Id.* Where the predicate acts occurred over a closed period, the prosecutor must prove a series of related predicates extending over a "substantial period of time." *Id.* We have eschewed the notion that continuity is *solely* a temporal concept, though duration remains the most significant factor. *See Hindes v. Castle*, 937 F.2d 868, 873 (3d Cir.1991); *Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593, 596–97 (3d Cir.1990); *see also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1421 (3d Cir.) (Alito, J., concurring and dissenting), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). However, where there is no threat of continuing racketeering activity, "duration is the *sine qua non* of continuity." *Hindes*, 937 F.2d at 873; *see also id.* at 875 ("unless these factors indicate a threat of continuing long-term racketeering activity occurring over a period of time, continuity depends on the actual duration of the predicates").

■ Continuity in an open-ended period, *i.e.* a period involving a series of predicate acts that project into the future, may be established by proving a threat of continuity, which exists where the predicate acts themselves involve threats of long-term racketeering activity, or where the predicate acts are part of an entity's regular way of doing business. *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. Additionally, the factors identified in *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir.1987), "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity," remain relevant after *H.J. Inc.* "as they bear upon the separate questions of continuity and relatedness."

*Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir. 1990).

The district court instructed the jury on the "pattern" requirement as follows:

The statute defines the pattern of racketeering activity as requiring at least two acts of racketeering activity within 10 years of each other. The wire acts charged here involve wire fraud, as I mentioned, and the Government must prove that the defendant knowingly and willfully committed at least two acts of racketeering to be sufficient to constitute a pattern of racketeering activity. It is not necessary that the two or more acts found to constitute the pattern be acts of the same kind or nature so long as you find beyond a reasonable doubt that the two acts of racketeering activity occurred within the time specified and that each was connected with the other by some common scheme, plan or motive so as to constitute a pattern such as participating in the affairs of the enterprise or promoting its objective.

*Taken together, the racketeering acts must have a relationship to each other plus continuity in order to form a pattern.* Conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, methods of commission or otherwise inner [*sic*] related by distinguishing characteristics and are not merely isolated events.

And finally, with respect to this element, the Government must prove that the defendant committed or participated in the conduct of the enterprise through a pattern of racketeering activity. And the word through links the second and fifth elements to each other. What the Government must show to make this linkage is that the pattern of racketeering activity was related to the activities of the enterprise or that the defendant was 'unable' to commit the racketeering acts forming the pattern solely by his position in the enterprise or involvement in or control over its affairs.

App. at 73–74 (emphasis added).

The court's charge, when viewed as a whole, does not reflect RICO's requirement

of continuity as set forth in *H.J. Inc.* Although the italicized portion of the charge does mention the term "continuity," the following sentence refers to the characteristics of relatedness. The jury was not instructed to make any findings regarding whether continuity or the threat of continuity existed by virtue of the duration of the schemes, the threat of future racketeering activity, the nature of the entity's "way of doing business" or otherwise. Viewed as a whole, therefore, the charge did not comport with *H.J. Inc.*'s requirement that the concepts of relatedness and continuity be separately proven.[14]

■ The Government has argued that a district court need not instruct the jury as to each sub-element of RICO's pattern requirement, including the requirement of continuity. We acknowledge that, where continuity can be inferred from the jury's findings, an erroneous instruction may constitute harmless error. *See, e.g. United States v. Kotvas*, 941 F.2d 1141, 1144–45 (11th Cir.1991) (although jury instructions did not instruct jury on the element of continuity as required by *H.J. Inc.*, defendant not prejudiced where the predicate offenses that formed the basis of the RICO charge, by their nature, established threat of continuity). However, we have no occasion to undergo a harmless error analysis here as we have already determined that reversal is required on the evidence issues.

■ We do note, however, that unless the Government can prove that there was a threat of continuity, it must be able to demonstrate that the pattern of racketeering activity occurred over a "substantial" period of time.[15] Under the indictment, 19 months is the longest period of racketeering activity the jury would be permitted to find.[16] We believe that a jury could find this period sufficient for a finding of continuity.

Since *H.J. Inc.*, we, along with other courts, have defined a "substantial period of time" without setting any bright line test. *See, e.g. Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991), *petition for cert. filed*, 60 U.S.L.W. 3600 (Feb. 14, 1992); *Hindes*, 937 F.2d at 875; *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 994 (8th Cir. 1989); *see generally*, Bart A. Karwath, Note, *Has the Constituency of Continuity Plus Relationship Put an End to RICO's Pattern of Confusion?*, 18 Am.J.Crim.L. 201 (1991). The Court in *H.J. Inc.* stated only that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." 492 U.S. at 242, 109 S.Ct. at 2902. While declining to define with precision the meaning of a "substantial period of time," we have never found such a period to exist where the racketeering activity occurred over a period of one year or less. *See Hughes*, 945 F.2d at 610–11 (12 months; collecting cases); *Hindes*, 937 F.2d at 875 (eight months); *Kehr Packages*, 926 F.2d at 1418–19 (eight months); *Banks*, 918 F.2d at 423 (eight months); *Marshall–Silver*, 894 F.2d at 597 (seven months). On the other hand, most courts that have found continuity in a closed period did so in cases involving periods of several years. *See Hindes*, 937 F.2d at 875 (collecting cases

14. The district court adopted the Government's proposed instruction, which was taken from a pre-*H.J. Inc.* version of the Devitt & Blackmar form. *See* App. at 149.

15. Initially, the existence of a large number of acts, multiple schemes, multiple victims, the similarity of the acts and the character of the unlawful activity—all of which may be found in this case—would certainly indicate that the racketeering activity was Pelullo's "way of doing business." Moreover, these factors would indicate a threat of future racketeering activity. Had the indictment been filed in 1986, or alternatively had the racketeering acts continued

through 1991, the jury's findings clearly would indicate a threat of continuity over an open-ended period of time. However, in light of the apparent five-year gap in criminal activity between the most recent racketeering act and the indictment, it would be quite difficult to characterize the period of racketeering activity in this case as open-ended.

16. The earliest racketeering act charged in the indictment was the July 2, 1984, wire transfer constituting racketeering act 61, and the latest was racketeering act 60, which the indictment charges occurred February 25, 1986.

ranging from period of four and one-half to 17 years).[17]

In *Swistock v. Jones*, 884 F.2d 755 (3d Cir.1989), we indicated that 14 months may be sufficient duration for a finding of continuity in a closed-ended case. *Id.* at 759. However, later cases have limited *Swistock* by stressing that the complaint in that case included allegations of misrepresentations and wrongdoing, which suggested that the period may have been open-ended. *See Kehr Packages*, 926 F.2d at 1413; *Banks*, 918 F.2d at 423; *Marshall–Silver*, 894 F.2d at 597. *But see Kehr Packages*, 926 F.2d at 1421–22 (Alito, J., concurring and dissenting) (*Swistock* rested on two independent grounds, one of which was that 14 months satisfied closed-ended continuity). Since *H.J. Inc.*, it appears that we have not found continuity in a closed-ended case on the basis of duration alone.

In our view, 19 months is sufficiently longer than "a few weeks or months" and indicates the type of long-term criminal conduct Congress sought to eradicate in enacting RICO. Our conclusion is consistent with that reached by the Court of Appeals for the Seventh Circuit which recently held that 17 predicate acts extending over a closed-ended period of approximately 20 months established continuity under *H.J. Inc.* *United States v. Stodola*, 953 F.2d 266, 270 (7th Cir.1992). *See also Farberware, Inc. v. Groben*, 764 F.Supp. 296, 306 (S.D.N.Y.1991) (repeated similar acts over ten-month closed period satisfied continuity requirement). We also note, however, that with the exception of the $114,-000 diversion, the racketeering activity charged in the indictment revolved around a single, apparently finite, scheme to defraud American. (We have as a matter of convenience referred to the two parts of the scheme as separate schemes as did the district court.) While the Court in *H.J., Inc.* rejected the requirement of proving multiple schemes in favor of a more rigid approach to demonstrating continuity, the number of schemes remains a relevant factor. *See* 492 U.S. at 240, 109 S.Ct. at

2901 ("although proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes") (emphasis in original). Ultimately, of course, continuity is a factual issue for the jury. We merely hold that the allegations contained in the indictment are legally sufficient to support a finding of continuity. Thus, we do not bar a retrial on the RICO count.

## B. The "Enterprise" Instruction

Pelullo also contends that the district court's instruction on the definition of "enterprise" was inconsistent with *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), and our holding in *United States v. Riccobene*, 709 F.2d 214 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). RICO defines the term "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The indictment charges that the enterprise in this case was made up of Pelullo and various corporations owned and controlled by him. App. at 22.

In *Turkette*, the Supreme Court considered whether an enterprise could include an exclusively criminal organization. The court of appeals had concluded that the term "enterprise" included only legal entities, reasoning that a "pattern of racketeering" would constitute a wholly criminal "enterprise," and therefore the apparent distinction in section 1962(c) between the two terms would be meaningless. The Supreme Court, however, rejected the premise that a "pattern of racketeering activity" *is* an "enterprise:"

17. *H.J. Inc.* involved six years of alleged racketeering activity, which the Court found sufficient. 492 U.S. at 250, 109 S.Ct. at 2906.

In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute.... The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Id.*, 452 U.S. at 583, 101 S.Ct. at 2528–29 (footnote omitted).

■ In *Riccobene* we construed *Turkette* to require proof of each of the three sub-elements referred to by the Court in this passage, thus requiring the Government to prove: (1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise be separate and apart from the pattern of activity in which it engages. *Riccobene*, 709 F.2d at 221–24. *See also United States v. Local 560 of Int'l Bhd. of Teamsters, etc.*, 780 F.2d 267, 290 (3d Cir. 1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 789–90 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *accord United States v. Sanders*, 928 F.2d 940, 943–44 (10th Cir.), *cert. denied*, — U.S. ——, 112

S.Ct. 142, 116 L.Ed.2d 109 (1991). These three issues are questions of fact, which, in the first instance, must be resolved by the jury. *Riccobene*, 709 F.2d at 222.

■ In instructing the jury on the enterprise element, the court did not explicitly refer to the three *Turkette–Riccobene* requirements:

As I indicated, the first element requires the Government to prove that the defendant was employed by or associated with an enterprise. The term enterprise includes any group of individuals associated in fact, thus an enterprise may be a formal business entity such as a corporation. It may be an individual or an informal association of corporations and an individual.

In this case, the indictment charges that the enterprise was a group of corporations and the defendant associated in fact. The existence of an enterprise is part of what the Government must prove in order for you to be able to find the defendant guilty.

You as a jury are entitled to infer the existence of an enterprise on the basis of circumstantial evidence. A RICO enterprise may conduct its affairs in relative secrecy making direct evidence hard to obtain. A jury is permitted to draw the natural inferences arising from circumstantial evidence of association.

Here, the Government contends that it presented direct evidence of the existence of the enterprise and of the defendant's control over the corporate entities that comprise the enterprise through several witnesses who have testified that Leonard Pelullo owned or controlled these corporations.

App. at 70–71.

Pelullo contends that this deficiency was fatal, as the instruction permitted the jury to find a RICO enterprise if they found only that Mr. Pelullo owned or controlled this group of corporations. By contrast, the Government argues that the *Turkette–Riccobene* instructions were not required since the enterprise here involved an association of *lawful* entities and, in any event,

that the proof conformed to the *Turkette–Riccobene* instructions even if required.

The purpose of requiring proof of common purpose, organization and continuity is " 'to avoid the danger of guilt by association that arises because RICO does not require proof of a single agreement as in a conspiracy case, and in order to ensure that criminal enterprises, which are RICO's target, are distinguished from individuals who associate for the commission of sporadic harm.' " *Atlas Pile Driving*, 886 F.2d at 996 (quoting *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987)). To this end, some courts have suggested that proof of enterprise must be distinct from proof of a pattern of racketeering. *See United States v. Lemm*, 680 F.2d 1193, 1200–01 (8th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). These cases have been criticized, however, as inconsistent with Justice White's recognition in *Turkette* that proof of these separate elements "may in particular cases coalesce...." 452 U.S. at 583, 101 S.Ct. at 2529. *See United States v. Perholtz*, 842 F.2d 343, 363 (D.C.Cir.1988); *United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir.), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983). As the court in *Perholtz* explained:

> To the extent these courts have held that the enterprise is not *equivalent* to the pattern of racketeering, we are in accord. The same group of individuals who repeatedly commit predicate offenses do not necessarily comprise an enterprise. An extra ingredient is required: organization. To the extent, however, these cases suggest that the organization can-

not be inferred from the pattern (or even more, that the organization cannot exist unless it does something other than commit predicate acts), we cannot agree. *Turkette* specifically recognized that the proof of the enterprise may 'coalesce' with the proof of the pattern, i.e., that the different conclusions may be inferred from proof of the same predicate acts.... The more extreme conclusion, that the enterprise must have non-criminal manifestations, was rejected by the precise holding of *Turkette*.

*Perholtz*, 842 F.2d at 363 (emphasis in original).

We agree with the *Perholtz* court's and the Government's assertion that, in the appropriate case, the enterprise can be inferred from proof of the pattern. However, to the extent that the Government suggests that there must be separate tests for lawful and unlawful enterprises, we do not believe this is necessary. The requisite *elements* of enterprise and pattern do not differ in these settings, rather it is the *proof* necessary to establish these elements that may or may not differ. In our view, a *Riccobene* instruction adequately covers both situations, and on remand the court's enterprise instruction should comport with the factors discussed in that case, though in the circumstance here any error in the charge on this point was probably harmless.

### C. The Wire Fraud Charges

Pelullo contends that the trial court's instructions improperly permitted the jury to convict him solely for violating his civil fiduciary duties.[18] As indicated above, the Government called numerous witnesses to establish that Pelullo did not

---

**18.** Both parties assert that under *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), a defendant cannot be convicted under the wire fraud statute for a scheme to defraud intangible rights and, therefore, to be convicted of wire fraud, Pelullo must have engaged in a scheme with the specific intent to defraud others of money or property. We note that *McNally* was prospectively superseded by statute in 1988 when Congress enacted 18 U.S.C. § 1346 but that section is not applicable here. However, we need not be concerned with

whether it would be lawful to convict under the wire fraud statute for engaging in a scheme to defraud others of fiduciary duties since the indictment charges Pelullo with having engaged in a scheme to defraud others of money. Inasmuch as we are reversing the wire fraud counts for evidentiary reasons, except for count 54 which could not have been affected by the aspect of the charge dealt with here, our discussion is plenary on this point, though undoubtedly there are discretionary elements involved with respect to this aspect of the charge.

manage the corporations he controlled in accordance with accepted standards. For example, Professor John C. Coffee, Jr., testified about the fiduciary duties imposed upon corporate officers. Pelullo objected to this testimony, arguing that there was a danger that the jury would convict him for failure to be a good corporate CEO. The Government countered that the evidence was relevant to the methods and means employed by Pelullo in carrying out his fraudulent schemes.

The federal wire fraud statute provides for criminal sanctions against anyone who, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, any ... signals ... for the purpose of executing such scheme or artifice...." 18 U.S.C. § 1343. The district court charged the jury that it must find beyond a reasonable doubt that Pelullo: (1) devised or intended to devise or participated in a scheme or artifice to defraud; (2) participated in that scheme with the specific intent to defraud; and (3) used the wires in interstate or foreign commerce in furtherance of the fraudulent schemes. The court further stated:

> The Government contends that the defendant submitted false documents to American Savings in support of its draw requests[,] arranged for the loan proceeds to be deposited in Delta's accounts, failed to maintain necessary accounting records to record the money that was received and spent on the art deco project, prevented an auditor for American Savings from having access to relevant financial records for the art deco project and prevented the timely filing of reports required by the SEC for the years 1984, '85 and '86 including 10Q and 10K reports.
>
> If you find beyond a reasonable doubt that the Government has proved *all or some of that evidence*, then you may find that this element of scheme or artifice has been satisfied.

App. at 53 (emphasis added).

Pelullo maintains that this instruction permitted the jury to find him guilty if the jury found that he failed to maintain necessary accounting records, or that he prevented an auditor for American from having access to financial records or that he prevented the timely filing of SEC disclosure reports. Further, he contends that the court compounded this error by giving a lengthy instruction on corporations law. During the instruction, the court stated that "[t]here were certain definitions given or that I think would be helpful" and then went into a discussion of a corporate officer's fiduciary duties of "fairness," "undivided loyalty," "honesty," and "unremitting duty of candor" under state law. *See id.* at 60–65.

While Pelullo's contentions initially appear convincing, the instructions as a whole made it clear that the jury could not find Pelullo guilty of any wire fraud violation without finding that he had the specific intent to obtain money or property.[19]

---

**19.** The court instructed that "[t]he word[s] scheme and artifice as used in the Wire Fraud Statute include any plan, pattern or course of action intended to deceive others *in order to obtain money or property* by false or fraudulent pretenses, representations or promises." (Emphasis added). After instructing the jury as to the three elements of wire fraud, the court charged that "[i]f the Government has failed to prove each element beyond a reasonable doubt then you must find the defendant not guilty." After concluding its discussion of corporate fiduciary duties, the court instructed: "Members of the jury, the good faith of Leonard A. Pelullo is a complete defense to the charge of wire fraud contained in Counts 1 through 53 of the indictment. Because good faith on the part of the defendant *is simply inconsistent with the intent to obtain money* by means of false or fraudulent pretenses, representations or promises alleged in that charge." (Emphasis added). Further, the court added:

> A defendant does not act in good faith even though he honestly holds a certain opinion or belief, [if] that defendant also knowingly makes false or fraudulent pretenses, representations or promises to others. The Wire Fraud Statute is written to subject to criminal punishment *only those people who knowingly obtain money or attempt to obtain money by means of false or fraudulent pretenses, representations or promises.*

However, although Pelullo was not prejudiced by the charge as a whole, and certainly was not as to count 54, we express some concern as to the potential for confusion that the issue of civil fiduciary duties may have had in this case. The Government offered testimony on this issue to demonstrate that Pelullo's disregard of the corporate form was evidence of the intent to defraud as well as evidence of the methods and means of the scheme. The district court properly circumscribed the scope of Professor Coffee's testimony so as to exclude testimony of specific legal requirements or opinion testimony as to whether Pelullo violated any of those requirements. Rather, the witness was permitted to give testimony in general terms on the corporate form and the responsibilities of corporate officers and directors vis-a-vis the corporation's shareholders.

While we accept the relevancy of this testimony, relevance must always be balanced against the potential for unfair confusion or prejudice. Pelullo is charged with the crimes of wire fraud and racketeering and not with the violation of civil fiduciary duties. While the testimony pertaining to, and the district court's discussion of, corporate fiduciary duties may have aided somewhat the jury's understanding of the nature of the crimes charged, an appropriate limiting instruction should have been given to guard against possible confusion or prejudice. At one point during Professor Coffee's testimony, the court did indicate that it would instruct the jury as to how the testimony should be used. However, insofar as we can ascertain, the court did not provide such an instruction. In our view, the court's rather lengthy discussion of the unremitting duties of a corporate officer, in addition to

the testimony on this issue, without a limiting instruction, could only have distracted the jury from the issues and made the Government's case appear stronger than it actually was.

### D. The Statute of Limitations

■ With the exception of count 54, which was racketeering act 60 of count 55, all of the acts of wire fraud occurred more than five years prior to the indictment. Although the statute of limitations applicable to mail fraud is generally five years, 18 U.S.C. § 3282, the Government relied on the limitations period provided under 18 U.S.C. § 3293(2). That section provides for a ten-year statute of limitations where "the offense affects a financial institution." Throughout the trial, Pelullo stressed that FCA Mortgage, a wholly-owned subsidiary of American, and not American, was the party to the art deco hotel loan agreement and hence the ten-year limitations period is inapplicable.

Pelullo observes that the term "financial institution" includes "an insured depository institution (as defined in [12 U.S.C. § 1813(c)(2) ])" and "a depository institution holding company (as defined in [12 U.S.C. § 1813(w)(1) ])...." 18 U.S.C. § 20(1), (6). He further notes that the Federal Deposit Insurance Act, to which 18 U.S.C. § 20 refers, defines a "subsidiary" to include "any service corporation owned in whole or part by an insured depository institution or any subsidiary of such . a service corporation." 12 U.S.C. § 1813(w)(4)(B). Pelullo essentially argues that this definitional distinction reflects Congress' intent to treat financial institutions and subsidiaries differently for purposes of the statute of limitations.

... In determining whether the Government has proven the defendant—proven that the defendant has acted with *an intent to obtain money by means of false or fraudulent pretenses, representations or promises* or whether the defendant acted in good faith, you must consider all of the evidence in this case bearing on the defendant's state of mind.

The burden of proving good faith does not rest with the defendant, because the defendant does not have any obligation to prove anything in this case. *It is the Government's*

*burden to prove to you beyond a reasonable doubt that the defendant acted with the intent to obtain money by means of false or fraudulent pretenses, representations or promises. If the evidence in the case leaves you with a reasonable doubt as to whether the defendant acted with an intent to obtain money by means of false or fraudulent pretense, representations or promises or in good faith, you, the jury, must acquit the defendant.*

App. at 67–68 (emphasis added).

The distinction between FCA Mortgage and American was relevant to two issues pertaining to the wire fraud allegations. First, for the extended statute of limitations to be applicable, the wire fraud violations must have affected American. Second, the indictment charges Pelullo with having engaged in a scheme to defraud American, and does not mention FCA Mortgage as a defrauded party. Thus, the issue relates to Pelullo's intent. Regarding the statute of limitations, the court gave the following charge:

Before the defendant can be found guilty of the wire fraud violation set forth in Counts 1 through 53 you must find that the Government has established beyond a reasonable doubt that the defendant engaged in a fraudulent scheme that effected [sic] American savings and Loan. You need not find that Leonard Pelullo specifically intended to defraud American Savings and Loan. All the Government must show is that the defendant engaged in a scheme with the specific intent to defraud and that the scheme effected [sic] American Savings and Loan.

For example, if you find that the defendant engaged in a fraudulent scheme to defraud Royale of money that was loaned to the company for Art Deco Hotel renovation costs, you may find the defendant guilty on Counts 1 through 53 if you find that this scheme effected [sic] American Savings and Loan.

Similarly, if you find that the defendant engaged in a fraudulent scheme to defraud FCA Mortgage Company, you may find the defendant guilty on Counts 1 through 53 if you also find that the scheme had an effect on American Savings and Loan.

App. at 68.

Earlier, after discussing the relationship between a parent and subsidiary corporation,[20] the court instructed:

[I]f you find that Leonard Pelullo engaged in a fraudulent scheme to defraud FCA Mortgage Corporation by diverting loan funds advanced to Royale, then you may find that Leonard Pelullo intended to defraud American Savings and Loan Association, because FCA was a wholly owned subsidiary of American.

*Id.* at 61–62.

According to Pelullo, the charge (1) was contrary to the specific decision Congress made in excluding an effect on a service subsidiary of an insured depository institution from the definition of a "financial institution" for the application of the extended statute of limitations; (2) improperly resolved disputed factual issues; and (3) amended the indictment.[21]

We may quickly dispose of the first argument for it assumes that a fraud perpetrated against a financial institution's wholly owned subsidiary cannot affect the parent, a clearly untenable assumption. Moreover, whether or not it is possible to perpetrate a fraud against a wholly owned subsidiary without affecting its parent, the statute is clear: it broadly applies to any act of wire

**20.** Members of the jury, the assets, including money of a wholly owned subsidiary corporation, belonged to the parent corporation and therefore indirectly to the shareholders of the parent corporation. Therefore, a fraudulent scheme to divert the assets of a wholly owned subsidiary deprives the parent corporation and its shareholders of property belonging to them, just as if the fraudulent scheme was directed against the parent corporation.

Here, the Government contends that Leonard Pelullo diverted $114,000 belonging to Palm Beach Heights Development and Sales Corporation to his personal use. The Government also contends that the evidence has shown that Palm Beach Heights was a wholly owned subsidiary of Royale.

If you find that Leonard Pelullo conducted a fraudulent scheme by diverting money belonging to Palm Beach Heights to his personal use and that Palm Beach Heights was a wholly owned subsidiary of Royale, then you may find that Leonard Pelullo engaged in a fraudulent scheme to defraud Royale and its shareholders of money.

App. at 61.

**21.** Our scope of review is plenary with respect to the legal sufficiency of the charge but so long as the court properly articulated the relevant legal criteria we review the particular language used on an abuse of discretion standard. *United States v. Phillips*, 874 F.2d 123, 125 (3d Cir. 1989); *United States v. Messerlian*, 832 F.2d 778, 789 (3d Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988).

fraud "that affects a financial institution." Pelullo's argument would have more force if the statute provided for an extended limitations period where the financial institution is the *object* of fraud. Clearly, however, Congress chose to extend the statute of limitations to a broader class of crimes. Furthermore, inasmuch as this case involved a parent and a subsidiary it cannot fairly be argued that the effect on the parent by reason of Pelullo's conduct was unreasonably remote as may have been the case if the fraud was directed against a customer of the depository institution which was then prejudiced in its dealings with the institution.

■ In addition, we are satisfied that the charge did not resolve factual issues or improperly amend the indictment. Pelullo argues that, at the very least, the jury should have been instructed to decide whether he intended to defraud American or some other entity. However, as set forth above, the jury was instructed numerous times that it could not convict Pelullo unless it found that he had the specific intent to defraud. Essentially, Pelullo now complains that the instruction permitted the jury to convict him of having engaged in a scheme to defraud FCA Mortgage rather than its parent American. Yet the charge did not instruct the jury that it *must* find that Pelullo intended to defraud American if it found that he intended to defraud FCA Mortgage. Rather the charge stated that it *may* so find. Even if the jury believed that the inference was mandatory, no reversible error would have resulted since the jury still was required to find as a fact that Pelullo had the intent to defraud, which was a necessary element of the crime of wire fraud. By contrast, the object of the fraud is not an element of the offense.

■ Similarly, even assuming that the instruction was at variance with the indict-

ment (which charges Pelullo with a scheme to defraud *American*), the variance did not constitute an impermissible amendment. "In order to rise to the level of an impermissible amendment, a variance must act to modify the indictment so that the defendant is convicted of a crime that involves *elements* distinct from those of the crimes with which he was originally charged." *United States v. Asher,* 854 F.2d 1483, 1497 (3d Cir.1988) (emphasis added), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989). However, where facts proved at trial vary from those alleged in the indictment, the variance does not constitute reversible error unless the defendant has been prejudiced thereby. *Id.; United States v. Castro,* 776 F.2d 1118, 1122 (3d Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986). *See also United States v. Weissman,* 899 F.2d 1111, 1114 (11th Cir.1990) ("A variance becomes reversible error only if the facts established in trial materially diverge from the facts in the indictment and the defendant suffers substantial prejudice as a result.").

No prejudice resulted from the purported variance. The evidence, including Pelullo's own testimony, established that American oversaw the art deco hotel loan and was involved in most aspects of the loan, even though it was not the signatory to the loan documents. Thus, Pelullo testified that he dealt with American and that American handled the loan. Therefore, it is inconceivable under the facts of this case that the jury could have found that Pelullo had the intent to defraud FCA Mortgage but not American. Additionally, even if some set of facts existed to make this possible, the instruction in no way impeded Pelullo's ability to put on a defense to the charges. Consequently, we find that the district court's charge as a whole did not affect Pelullo's ability to raise a legitimate statute of limitations defense.[22]

22. The jury was not advised that it was necessary for statute of limitations purposes to find that the fraudulent scheme "affected" American, and we see no reason why it was necessary to do so. However, the language which the district court used to address this statute of limitations issue (quoted at 218, *infra*) risked confusing the jury. The jury might well have believed that the language was a further definition of the substantive offense of wire fraud. To avoid this risk in the event of a retrial the trial court might consider dispensing with that language, simply

Moreover, even if Pelullo had argued that the court's charge constituted an impermissible amendment, as opposed to a variance, *see United States v. Zauber,* 857 F.2d 137, 151 (3d Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), no amendment occurred in this case for the distinction between FCA Mortgage and American was only a legal one. Under the facts of this case, it would have been impossible for Pelullo to have intended to defraud FCA Mortgage without intending to defraud American.

█ Additionally, the district court did not err in barring Pelullo from offering proof relating to civil litigation involving FCA Mortgage and the art deco hotels. The hotels claimed that FCA Mortgage had wrongly failed to fulfill a loan commitment made in the fall of 1985, and FCA Mortgage counterclaimed, alleging that the proceeds of the loan had been diverted. A district court in Miami found for the hotels and approved a settlement requiring FCA Mortgage to continue funding the loan. While Pelullo claims that the evidence would have been highly relevant to the factual issue of whether the schemes affected American, we believe that this litigation was only marginally relevant at best, and that the court acted within its discretion in preventing this testimony.

## IV.

### PELULLO'S SUMMATION

█ Pelullo argues that he was improperly prevented from challenging the credibility of Government witnesses based on evidence in the record. During summation, Pelullo's counsel attempted to insinuate that the prosecutors suborned perjury by noting that three Government witnesses had changed their testimony following meetings with the Government. For example, James Bishop oversaw disbursement of construction loan funds for American. A month before trial, Bishop provided Pelullo with a sworn written statement stating that it primarily relied on on-site inspection reports for purposes of funding the art deco hotels project. At trial, however, Bishop testified on direct that he actually relied on the borrower's documentation, not on-site inspections. Bishop admitted that his testimony did not conform with the statement made approximately 40 days prior to trial, and that between the time the prior statement was made and the trial, Bishop had met with prosecutors and the FBI. Counsel also examined Bishop regarding conversations he had with the Government, and suggested that the prosecutors were dissatisfied with his previous statement.[23]

Robert Comegys was a construction consultant who was responsible for preparing several draw requests submitted on the art deco hotel projects. Approximately one year before Pelullo's trial, in a civil action, Comegys gave sworn testimony that the amount of money Pelullo instructed him to request never exceeded the amount of work completed on the project. At Pelullo's trial, Comegys changed his testimony, stating that many of the draw requests he had prepared for the project overstated the amount of work done. The defense explored this apparent inconsistency during cross-examination. Comegys denied that he gave false testimony either at the prior deposition or during Pelullo's trial, but explained that things "came to him" after the deposition. In response to counsel's questioning, Comegys acknowledged that his opinion changed subsequent to, but not as a result of, his being deposed and speaking with the prosecutor.

Finally, Pelullo suggested that the Government employed heavy-handed techniques to influence the testimony of Janice Spreadborough, a disbursement coordinator for FCA Mortgage. Pelullo's counsel attempted to question Spreadborough about an affidavit she had previously

---

advising the jury, after defining the substantive offense of wire fraud, that in order to find the defendant guilty it must also find that the government had established that the scheme affected American.

**23.** The Government objected to this line of questioning arguing that there was no foundation that it had acted improperly.

signed, and about conversations with the Government regarding the draw requests. After the Government objected to the line of questioning on relevancy grounds, the defense proffered that the witness was "pestered" by the prosecutor until she would testify in a manner consistent with the Government's theory of its case. The prosecutor categorically denied the allegations, and again objected on relevancy grounds. After a sidebar, the court sustained the objection.

Not surprisingly, during summation, the defense highlighted the discrepancies in testimony. Counsel noted the change in Comegy's testimony, and stated that the only thing that had occurred between the time of the original testimony and the trial was the witness' meeting with the prosecutor. When counsel began to make a similar argument regarding the testimony of James Binns, the Government objected on the ground that there was no foundation in the record to suggest that the prosecutors influenced any of the witnesses' testimony. The court sustained the Government's objection, and stated to the jury that "there is nothing in the record of this case to indicate that the government and the ... prosecutors did anything to cause these witnesses to change their testimony and I have instructed counsel not to make that argument."

 The credibility of witnesses is an issue for the jury, and both the prosecutor and defense counsel may explore areas that are relevant to a witness' credibility, such as plea agreements or promises of leniency. Normally these areas are borne out during cross-examination, and indeed a denial of a defendant's right to pursue such issues in cross-examination may result in reversible error. *See United States v. Murray*, 445 F.2d 1171, 1174 (3d Cir.1971). However, defense counsel may not suggest that the Government has engaged in prosecutorial misconduct, such as subornation of perjury, unless there is a foundation in the record to support such charges. In these situations, the district court must take special precaution to prevent counsel on either side from making improper argument.

Where there is no foundation for the defendant's assertions, the prosecutor will undoubtedly feel the need to respond during rebuttal which often leads to improper prosecutorial vouching as to the credibility of witnesses or to the prosecutor's own integrity or that of his or her office. *See United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985); *United States v. Pungitore*, 910 F.2d 1084, 1120–27 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *United States v. Di Pasquale*, 740 F.2d 1282, 1295–97 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). Where the defense has made improper remarks, the "reply" or "invited response" doctrine permits the prosecution to attempt to neutralize the remarks, so long as he or she does not use the defendant's accusation as a springboard affirmatively to attack the defense. *See Young*, 470 U.S. at 12–13, 105 S.Ct. at 1045; *Pungitore*, 910 F.2d at 1126; *Di Pasquale*, 740 F.2d at 1296.

In this situation the prosecution should make a timely objection to the charge of misconduct, and the trial judge should prevent the argument from being made. In *Young*, the Supreme Court recognized:

Plainly, the better remedy in this case, at least with the accurate vision of hindsight, would have been for the District Judge to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond. Arguably defense counsel's misconduct could have warranted the judge to interrupt the argument and admonish him, ... thereby rendering the prosecutor's response unnecessary. Similarly, the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury. Defense counsel, even though obviously vulnerable, could well have done likewise if he thought that the prosecutor's remarks were harmful to his client.

470 U.S. at 13, 105 S.Ct. at 1045.

Similarly, this court in *Di Pasquale* took "occasion, once again, to remind the district

courts of their responsibility to forestall unfair provocation and to constrain prosecutorial misconduct." 740 F.2d at 1297.

The district court did not abuse its discretion in preventing Pelullo during summation from arguing that the prosecutor had engaged in misconduct with respect to these witnesses. Although there was some cross-examination on the issue of Government influence, the record did not support a foundation for the suggestion that the prosecutor had suborned perjury, which was essentially the inference counsel wished the jury to draw. By prohibiting counsel from making this argument, counsel was in no way prevented from highlighting the inconsistencies in testimony. "The purpose of summations is for the attorneys to assist the jury in analyzing, evaluating and applying *the evidence."* *United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978) (emphasis in original). Given the Supreme Court's admonition in *Young* as well as our similar admonition in *Di Pasquale,* the district court acted properly in forestalling counsel's improper insinuations.

## V.

### TESTIMONY OF PHILIP LEONETTI

■ Pelullo also contends that the court erred in admitting hearsay testimony of Philip Leonetti, a former member of the Philadelphia mafia turned government informant. Leonetti testified about a $200,-000 loan that Pelullo owed to Tony DiSalvo. The testimony was relevant to count 54, which charged Pelullo with diverting $114,-000 to repay the loan. Leonetti testified that he and his uncle, Nicky Scarfo, were contacted by DiSalvo and asked to help collect the loan in exchange for 50% of whatever was collected. Leonetti and Scarfo agreed, and met with Pelullo. Within a few weeks of the meeting, Leonetti received $30,000 in cash from DiSalvo, which Leonetti understood to be a partial payment of Pelullo's debt.

Specifically, Pelullo objects to the statements by Leonetti that "Tony DiSalvo

asked me to help him collect a couple hundred thousand dollars that Leonard Pelullo owes him. He said he was having a problem collecting the money, Leonard was ducking his calls, he said he couldn't get in touch with him and he asked for our help to collect his loanshark money. He said anything that we would collect we would whack 50/50." Leonetti then testified that "I told [Nicky Scarfo] what Tony DiSalvo told me, that he needed help collecting the money from Leonard. He [Scarfo] says, all right, when we get down there, we'll reach out for him and talk to Leonard Pelullo." Finally, Leonetti testified that the debt was repaid "in cash ... by Leonard Pelullo." The district court overruled Pelullo's repeated hearsay objections until Leonetti testified that "Tony DiSalvo brought me the money and told me that he received it, the money [from Pelullo.]" In response to Pelullo's hearsay objections, the Government maintained that the statements were verbal acts that explained the transactions and, additionally, that the statements were admissible as statements of a co-conspirator.

The Government now contends that Leonetti's testimony was not hearsay since the statements were not offered to prove the truth of what DiSalvo said. "Rather," the Government argues, "it was offered to explain Leonetti's reason for meeting with [Pelullo]. It was of no moment whether DiSalvo was telling the truth. What was relevant was Leonetti's state of mind." Government's Brief at 48.

We need not determine whether the testimony was hearsay for we are satisfied that if there was an error it was harmless since Pelullo, though advancing a benign explanation for the source of the funds to repay the debt, admitted all of these facts under oath during his direct examination. Leonetti, after all, was not concerned with the source of the funds to repay DiSalvo.[24] We agree with the Government that at least some of Leonetti's evidence can be admitted provided proper instructions are given, as the evidence would not be offered

---

24. Leonetti's cross-examination revealed the attitude of the mafia concerning murder, a distinction apparently being made between a ruthless murder and a legitimate murder:

Q: Mr. Leonetti, let me ask you this. Based upon what you've testified to in other proceedings, isn't it a fact that you are an admitted ruthless murderer?

to establish the truth of the fact asserted. Inasmuch as the evidence may be offered on a retrial of the RICO count, care should be taken to ensure that there are no hearsay violations and that appropriate instructions are given.

## VI.

### THE COURT'S COMPLIANCE WITH FED.R.CRIM.P. 30

■ Finally, Pelullo argues that the district court failed to conduct an adequate charge conference under Fed.R.Crim.P. 30. We need not dwell on this issue as it is in large part moot. In principle, however, we are in general agreement with Pelullo that the procedure employed by the district court did not comply with Rule 30. The day before summations, without knowing what the district court was going to charge, Pelullo's counsel attempted to object to the Government's proposed instructions. Although counsel was given some opportunity to make general objections, the court refused to entertain specific objections to each of the Government's proposed instructions that the defense believed were incorrect. Additionally, the court refused to inform counsel of its charge until just prior to summations. After the court instructed the jury, it did give counsel an opportunity to object at sidebar. Although it is debatable whether Pelullo complied with Rule 30 by not attempting to make specific objections at that point,[25] we need

A: I'm an admitted murderer, sir, yes sir.
Q: You are an admitted *ruthless* murderer, are you not?
A: I'm not ruthless, I'm a murderer.
Q: I'm going to direct your attention, Mr. Leonetti, to criminal case 89–21–01, 02, 03 and 04, your testimony under oath January 8th, 1990, in that chair before this judge.
Q: It's not ruthless to shoot someone in the back of the head?
A: Yes it is, I guess it's ruthless.
That was your answer. Do you recall saying that?
A: Yes sir, but that's not my whole answer.
Q: It's not your whole answer?
A: Can I explain?
Q: No, I don't need an explanation, Mr. Leonetti. Did you say you were ruthless or not?
A: No sir.
Q: You didn't say that?
A: No sir.

not reach that issue. However, for remand, we feel it appropriate briefly to comment on Rule 30 and its requirements.

Rule 30 provides:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in requests.... The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury. The court may instruct the jury before or after the arguments are completed or at both times. No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

The use of the imperative "shall" indicates that Rule 30 is mandatory. *See United States v. Schartner*, 426 F.2d 470, 479 (3d Cir.1970). The rule has several purposes, including to "require the judge to inform the trial lawyers in a fair way what the charge is going to be, so that they may intelligently argue the case to the jury." *United States v. Wander*, 601 F.2d 1251, 1262 (3d Cir.1979) (quoting *Ross v. United States*, 180 F.2d 160, 165 (6th Cir.1950));

Q: So when the transcript says, "yes it is, I guess it's ruthless," the transcript is mistaken?
A: The transcript is correct, but if I may explain what I said there—
 ....
THE COURT: Go ahead, you may explain.
A: I said if it's ruthless to kill somebody, [then] yes it is ruthless, but I was raised in the La Cosa Nostra. We had our own rules in the La Cosa Nostra. It wasn't ruthless in the La Cosa Nostra to kill people, that was our way of life. That's how we lived.
Q: Did any of these people that you've been involved in the assassinations of, Mr. Leonetti, have wives, children, families?
A: Yes sir.
6/25/91, 10:24:01–10:25:45.

**25.** Pelullo argues that it is unreasonable to assume that the court would have entertained its objections at that point after the court's rebuff of the previous day.

*accord United States v. Pena,* 897 F.2d 1075, 1084 (11th Cir.1990). Moreover, by prohibiting counsel from assigning as error any portion of the charge not specifically and distinctly objected to, the rule ensures that the trial court have an opportunity to correct any error in the charge before the jury begins its deliberations. *See United States v. Salinas,* 601 F.2d 1279, 1283 (5th Cir.1979). Finally, the purpose of permitting the parties to object out of the hearing or presence of the jury is to permit full argument of objections and "to avoid the subtle psychological pressures upon the jurors which would arise if they were to view and hear defense counsel in a posture of apparent antagonism toward the judge." *Hamling v. United States,* 418 U.S. 87, 134, 94 S.Ct. 2887, 2916, 41 L.Ed.2d 590 (1974); *see also Salinas,* 601 F.2d at 1283; *Schartner,* 426 F.2d at 479–80; Fed. R.Crim.P. 30 (1966 Advisory Committee Notes).

Prior to the time the court determined which instructions it was going to give to the jury, the court was not required to entertain each of the defendant's objections to the government's proposed charge. "Nothing in Rule 30 transfers from the district court to counsel the function of deciding at what point in the trial, consistent with established practice, counsel shall be given the opportunity required by Rule 30 to make a record on the instructions given by the court." *Hamling,* 418 U.S. at 132, 94 S.Ct. at 2915. Necessarily, the trial judge has a certain degree of latitude in determining how, and at what point in time, to conduct a charge conference. Although typically a court will find it helpful to attempt to resolve counsels' objections prior to giving its charge, ultimately this is a matter within the court's discretion.

Once counsel is advised of the court's charge, however, Rule 30 requires that counsel be afforded a fair opportunity to make specific objections, lest they risk waiving the right to rely on an erroneous charge as grounds for appeal. While the rule does not specify whether objections should be made before or after the court instructs the jury,[26] inherent in the rule is

26. The rule only requires that the objections be out of the hearing or presence of the jury if so

the requirement that, at either time, some opportunity be afforded.

Thus, while the district court was not required to permit the defense to object to each of the Government's proposed instructions before the court determined what it was going to charge, it *was* required to hear specific objections at the latest, after it gave its charge. As indicated above, by permitting full and fair debate of the court's charge, ideally the court can correct any errors before the jury begins its deliberations. Given the explicit and mandatory nature of Rule 30, it is irrelevant that the procedure may be time consuming where the instructions are lengthy or where a party has numerous objections. If the objecting party's interpretation is correct, judicial economy will be furthered by taking the time to ensure that each instruction is an accurate reflection of the law. *See United States v. Loya,* 807 F.2d 1483, 1492 (9th Cir.1987) (describing optimal procedure whereby trial court informs counsel of the instructions he or she intends to give to the jury, listens to counsel's objections and then permits counsel to renew any prior objections after the jury is instructed).

Accordingly, while we need not determine whether the requirements of Rule 30 technically were met by the district court or by counsel, we underscore the purposes underlying that rule, which must be borne in mind by the district court in conducting its charge conference and by counsel in objecting to specific instructions. While the issue is not moot as to count 54, we are satisfied that the error, if any, was harmless on that count. *See Hamling,* 418 U.S. at 135, 94 S.Ct. at 2916.

## VII.

## CONCLUSION

The district court erred in admitting numerous documents as well as the summaries prepared by Agent Wolverton. The documents were hearsay and the Government did not comply with the foundation requirements of Rule 803(6), the business records exception. Further, the residual hearsay exception, Rule 803(24), was not

requested.

complied with as the Government did not notify Pelullo that it planned to seek the admission of the documents on Rule 803(24) grounds. The summary schedules prepared by Agent Wolverton were not admissible under Rule 1006 as they were not based on admissible evidence. Inadmissible hearsay does not become admissible merely by virtue of being summarized on a chart. We conclude that these errors were not harmless and therefore we must reverse the convictions on all counts except count 54.

For purposes of remand, we also note that the court erred in charging the jury under RICO with respect to the "pattern of racketeering activity" and "enterprise" elements, and that the court must ensure that the testimony of Leonetti is admissible.

Finally, the court did not err in its wire fraud instruction; in ruling on the statute of limitations defense to the wire fraud counts; in barring Pelullo from offering proof on the statute of limitations issue; and in preventing Pelullo from attacking the credibility of government witnesses in summation.

Accordingly, the judgment of conviction and sentence of August 30, 1991, on count 54 will be affirmed, the judgment of convictions and sentences on the remaining counts will be vacated, and the case will be remanded for a new trial on all counts other than count 54 and, if appropriate, resentencing on that count.

## SUR PETITION FOR REHEARING BEFORE ORIGINAL PANEL

July 27, 1992.

The petitions for panel rehearing filed by appellant and appellee in the above entitled case having been submitted to the judges who participated in the decision of this court, and no judge who concurred in the decision having asked for rehearing, the petitions for rehearing are denied.