NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2851
_____

UNITED STATES OF AMERICA

v.

KIMBERLY SPONAUGLE,
                                        Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal No. 1-19-cr-00103-001)
District Judge: Honorable Leonard P. Stark

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
on April 9, 2024

Before: CHAGARES, *Chief Judge*, PORTER, and SCIRICA, *Circuit Judges.*

(Filed: September 11, 2024)

_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**SCIRICA**, *Circuit Judge*

Kimberly Sponaugle appeals her conviction for wire fraud. She argues that the District Court erred in granting the Government's motion *in limine* to (1) admit lay opinion testimony of accountants with personal knowledge of her scheme to defraud her employer; (2) introduce her tax returns as intrinsic evidence of fraud and evidence of her intent and knowledge; and (3) preclude her from introducing a government witness's efforts to correct her testimony in an unrelated proceeding. We disagree and will affirm the District Court's judgment of conviction and sentence.

I.

From 2005 to 2018, Kimberly Sponaugle worked as an office manager for All About Women ("AAW"), a small, privately-owned healthcare practice in Delaware. Her responsibilities included reviewing monthly checking and credit card statements, entering financial information into the company's QuickBooks ledger, and tracking credit card charges and reimbursements. AAW retained the accounting firm Stephano Slack to reconcile their accounts, but the firm did not have access to or review AAW's credit card statements. Sponaugle nevertheless told AAW's head partner, Dr. Diane McCracken, that Stephano Slack performed monthly audits of AAW's accounts, which would have involved a review of credit card statements.

AAW gave Sponaugle a corporate credit card to use for business-related expenses. Sponaugle knew that if she used her AAW credit card to make a personal purchase, she would have to reimburse the company.

Beginning in 2012 and continuing until her termination in 2018, Sponaugle made

2

numerous unauthorized, personal purchases with her AAW credit card and paid her AAW credit card bills with electronic transfers from the company's checking account. She concealed her purchases by mislabeling them in AAW's QuickBooks ledger.

In March 2018, McCracken discovered Sponaugle's unauthorized personal transactions, which prompted her to ask Certified Public Accountant ("CPA") Ralph Cetrulo and accountant Kathy Storm at Stephano Slack to investigate Sponaugle's spending. AAW terminated Sponaugle and contacted law enforcement. An FBI investigation determined Sponaugle made over 3,000 unauthorized transactions totaling over $250,000.

Sponaugle was charged with one count of wire fraud, in violation of 18 U.S.C. § 1343. In its pretrial memorandum and omnibus motion *in limine*, the Government sought several evidentiary rulings, which the District Court addressed during a pretrial conference.

First, the Government sought to admit lay opinion testimony from Cetrulo, Storm, and FBI forensic accountant Michelle Hoffman. The Government explained that Cetrulo would discuss preparing Sponaugle's tax returns, describe what information he usually sought from clients when preparing taxes, and provide lay opinion testimony respecting a taxpayer's obligation to declare non-monetary income on her taxes. Next, the Government explained that Storm would testify about how QuickBooks software is used for bookkeeping, as well as the difference between reconciliations, which Storm performed for AAW, and more thorough accounting practices like audits. Finally, the Government explained that Hoffman would testify about her participation in the FBI's

3

investigation into Sponaugle's spending. Hoffman would also explain whether AAW's ledgers were consistent with the proper use of QuickBooks based on her personal knowledge of the software as a forensic accountant. The Government argued that all three accountants could give lay opinion testimony because of their personal knowledge, either as AAW's outside accountants or as an FBI investigator.

Sponaugle objected to the Government's request to admit the accountants' testimony as lay opinion testimony, explaining that any testimony they could give about accounting, bookkeeping, or the operation of QuickBooks software would rely on specialized knowledge. Sponaugle also objected to the Government's purported failure to provide written summaries of the basis for their testimony as required for the admission of expert testimony under Federal Rule of Criminal Procedure 16(a)(1)(G).

The District Court granted the Government's motion to admit the accountants' lay opinion testimony, finding that the testimony was based on personal knowledge. The District Court also concluded that because the accountants were giving lay witness testimony, the Government did not need to provide Rule 16(a)(1)(G) disclosures.

Second, the Government sought to admit Sponaugle's tax returns. The Government argued that Sponaugle's failure to report her non-monetary income from AAW was intrinsic evidence that helped to directly prove the wire fraud charge by showing her intent to defraud and knowledge of the fraud. The Government also argued that these omissions from Sponaugle's tax returns were evidence of contemporaneous, uncharged acts that facilitated the charged offense. In the alternative, the Government argued that her tax returns were admissible, relevant evidence of Sponaugle's intent and

4

knowledge under Federal Rule of Evidence 404(b).

Sponaugle objected to the Government's use of the tax returns as evidence that she committed wire fraud, arguing that their admission for that purpose would require a "mini trial" on her knowledge of taxable income and that their probative value was substantially outweighed by the potential of unfair prejudice.

The District Court granted the Government's motion, finding that the tax returns were intrinsic evidence of wire fraud, as well as valid, non-propensity evidence of Sponaugle's intent and knowledge of the crime under Rule 404(b). The District Court found that any potential prejudice was outweighed by the probative value of the evidence, especially because the District Court would prohibit the Government from suggesting or arguing that Sponaugle committed tax fraud.

Third, the Government sought to preclude Sponaugle from introducing evidence of McCracken's attempt to submit a deposition errata sheet in an unrelated medical malpractice action in Delaware Superior Court. There, the Superior Court granted the plaintiff's motion to strike McCracken's errata sheet, noting that her proposed changes were significant enough to frustrate the purpose of the deposition. The Government argued that extrinsic evidence of the deposition, the errata sheet, and the Superior Court's opinion striking the errata sheet should not be introduced in Sponaugle's trial under Federal Rules of Evidence 403 and 608(b). Sponaugle responded that she could use the errata sheet and Superior Court opinion to dispute McCracken's credibility at trial.

The District Court granted the Government's motion under Rule 403, finding that McCracken's submission of the errata sheet likely reflected a strategic decision by her

attorney, rather than her penchant for truthfulness, and that the "fairest reading" of the Superior Court's opinion was that the "decision . . . was entirely unaffected by any views . . . as to whether or not Dr. McCracken was being truthful or untruthful." App. 345. The District Court concluded that this evidence had "close to zero . . . probative value[,]" which was outweighed by a high risk of unfair prejudice, jury confusion, and potential for waste of time that could be caused by explaining an unrelated Superior Court proceeding and Delaware civil discovery rules. *Id.* at 345–46.

At trial, the Government presented Cetrulo, Storm, and Hoffman as lay witnesses. Cetrulo testified about the accounting services that Stephano Slack provides, including audits, which could involve reviewing a company's credit card statements, and reconciliations, which would not. Cetrulo explained that Stephano Slack performed reconciliations for AAW, which entailed "just ensuring the bank statement agrees to the general ledger." App. 1297. Cetrulo testified that he prepared Sponaugle's tax returns. Cetrulo explained that when he prepares tax returns, he consults a client's W-2 Form, which should include both cash and noncash income. He defined non-cash income as any "non de minimus [sic]" benefit conferred by an employer upon an employee and provided examples. App. 1271. Finally, Cetrulo testified that AAW retained Stephano Slack to investigate Sponaugle's purchases and that he supervised the investigation that Storm carried out.

Storm described the steps she took when performing monthly reconciliations for AAW, including comparing AAW's bank statements with the company's QuickBooks ledger to ensure that their bottom lines matched. She testified that she did not have

6

access to or review AAW's credit card statements when she conducted the reconciliations. She described QuickBooks as a "very user-friendly accounting system" that "you don't have to receive formal training to . . . use." App. 1338, 1362. Finally, Storm testified that to investigate Sponaugle's spending, she reviewed Sponaugle's credit card statements and QuickBooks ledger, categorized the purchases, and created a spreadsheet for AAW's review.

Hoffman testified about her investigation into Sponaugle's spending, which included reviewing Sponaugle's credit card statements, purchase receipts, and AAW's QuickBooks ledger. Hoffman briefly described QuickBooks as a program that permits a user to record funds coming into or out of a business and to group credit card transactions into categories. She explained how she compared Sponaugle's credit card purchases with the corresponding QuickBooks entries and found that Sponaugle had mislabeled these personal purchases. She noted how she cross-referenced purchases with contemporaneous communications to determine whether the transaction was authorized and added up the total amount of unauthorized purchases Sponaugle made.

The Government offered additional witnesses to testify about Sponaugle's unauthorized spending. FBI Special Agent Joshua Wilson described law enforcement's investigation and introduced into evidence the financial records about which Hoffman testified. Wilson described QuickBooks as a "user-friendly basic accounting software that many small businesses use" to "keep[] track of money coming into . . . and leaving the practice." App. 738–39. Dr. Diane McCracken testified that she was unaware that Stephano Slack was not reviewing AAW's credit card statements until she discovered

Sponaugle's unauthorized credit card transactions. For her part, McCracken identified specific unauthorized purchases that Sponaugle made.

After a seven-day trial, the jury found Sponaugle guilty of wire fraud, and the District Court sentenced her to twenty-four months of probation. Sponaugle timely appealed.

## II.[1]

"We review the District Court's decisions as to the admissibility of evidence for abuse of discretion." *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000) (citing *United States v. Pelullo*, 964 F.2d 193, 199 (3d Cir. 1992)). To the extent the trial court's rulings turned upon an interpretation of the Federal Rules of Evidence, our review is plenary. *Id.*

## A.

First, Sponaugle argues that the District Court erred by permitting Cetrulo, Storm, and Hoffman to offer lay opinion testimony.[2] She urges that their topics of proposed testimony and testimony they gave at trial were based on their technical and specialized accounting knowledge. We are not persuaded.

A lay witness may give opinion testimony that is "(a) rationally based on the

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

[2] Sponaugle contends that because the accountants gave expert testimony, she was unfairly prejudiced by the Government's failure to provide Rule 16 expert witness disclosures. Because we find that the District Court did not abuse its discretion in admitting the accountants' testimony as lay opinion testimony, we conclude that the Government was not obligated to provide Sponaugle with Rule 16 expert witness disclosures.

witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. But Rule 701 does not prohibit a witness from giving lay opinion testimony simply because she may possess specialized knowledge. *See United States v. Savage*, 970 F.3d 217, 286 n.77 (3d Cir. 2020). Rather, "[w]hen a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *United States v. Fulton*, 837 F.3d 281, 301 (3d Cir. 2016) (quoting *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009)). In other words, "as long as the technical components of the testimony are based on the lay witness's personal knowledge, such testimony is usually permissible" under Rule 701. *Id.*

First, Sponaugle urges that the District Court erroneously concluded that Cetrulo's proposed testimony about the information he seeks from clients when preparing taxes and the income disclosures required for tax filings was permissible lay opinion testimony. But as the Government explained, Cetrulo prepared Sponaugle's taxes, and would testify about the information she provided him, as well as the information he usually received from other clients. Accordingly, his testimony was within the scope of Rule 701 because it was based on his personal knowledge, as well as "particularized knowledge that [he] ha[d] by virtue of his . . . position." Fed. R. Evid. 701 Advisory Committee's Note (2000).

Second, Sponaugle argues that the trial court improperly allowed lay opinion

9

testimony about the difference between a reconciliation and audit. Yet neither Cetrulo nor Storm provided general definitions of an "audit" or "reconciliation," or assessed whether the services that they provided to AAW conformed to the industry definition of those terms. *Cf. United States v. Kerley*, 784 F.3d 327, 340 (6th Cir. 2015) (finding that the district court did not abuse its discretion by permitting underwriters to offer lay opinion testimony because their testimony was derived from their knowledge of their employers' underwriting policies and did not concern generally applicable standards in the mortgage lending industry). Instead, Cetrulo defined these terms within the context of the services that Stephano Slack provided to its clients, including AAW, and Storm described the reconciliation process based on her own experience conducting reconciliations for AAW. Because Cetrulo's and Storm's testimonies were derived from their personal experience as AAW accountants, the District Court did not abuse its discretion in admitting it under Rule 701.

Third, Sponaugle challenges Storm's testimony about QuickBooks's functionality. As Storm explained, QuickBooks is a user-friendly software, and her review of AAW's ledger essentially entailed matching bottom-line amounts. Accordingly, Storm could offer lay witness testimony on this topic because it was a "relevant, readily-understandable . . . procedure[] or operation[] of which [she] had firsthand knowledge."[3] *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002); *see also United States*

---

[3] Indeed, at the pretrial conference, Sponaugle's counsel acknowledged that basic bookkeeping concepts, such as ledgers, checkbooks, credits, and debits were "pretty basic" and "probably . . . familiar[] with most lay people." App. 323.

10

*v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006) (noting that the "average layperson today may be able to interpret the outputs of popular software programs as easily as he or she interprets everyday vernacular"). And, as an accountant with personal knowledge of AAW's QuickBooks ledger, Storm could provide lay opinion testimony about her review of AAW's records. *See Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980).

Finally, Sponaugle argues that Hoffman's proposed testimony about her "perspective" of AAW's QuickBooks ledgers and the proper operation of QuickBooks—as well as her testimony about the investigative reports she generated from her review of AAW's QuickBooks software—was derived from Hoffman's specialized education and training. Sponaugle Br. 50. We disagree.

Hoffman's proposed testimony about the proper operation of QuickBooks was based on her personal experience using the software and as an investigator in Sponaugle's case. Hoffman testified to the "user friendly" software's basic functionality based on her experience, explaining how a user could categorize and record any cash coming into or flowing out of a business, including credit card transactions. App. 1396–99. Like Storm, Hoffman could testify to the software's basic bookkeeping functionality. *See Caballero*, 277 F.3d at 1247. Improper use of a ledger, such as mislabeling entries, is not so complex or specialized that a lay witness cannot provide opinion testimony consistent with her personal experience. Accordingly, the District Court did not abuse its discretion in admitting Hoffman's proposed testimony respecting the proper use of QuickBooks.

And Hoffman's trial testimony about the Excel sheet summaries of Sponaugle's spending was plainly proper lay witness testimony because she personally conducted the investigation and prepared the summaries. *See United States v. Georgiou*, 777 F.3d 125, 144 (3d Cir. 2015) (no abuse of discretion in admitting SEC employee's testimony as lay opinion testimony when the witness "provided factual information and summaries of voluminous trading records that he had personally reviewed in his capacity as an SEC employee and as part of the SEC's investigation of" the defendant); *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) ("A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.'" (quoting *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004)). And the steps Hoffman took during the investigation, such as matching credit card charges with QuickBooks ledger entries, categorizing unauthorized spending, and calculating Sponaugle's total unauthorized purchases, are readily understandable procedures for an ordinary layperson. *See United States v. Hamaker*, 455 F.3d 1316, 1331–32 (11th Cir. 2006) (finding that FBI investigator's review and summary of QuickBooks records was "within the capacity of any reasonable lay person" where the investigator "reviewed and summarized" voluminous financial documents, "matched a small subset" of the records, presented summations and "used an Excel spreadsheet to calculate some of these figures").

Even if the District Court erred in permitting the three accountants to offer lay

12

opinion testimony, any error was harmless. "Discretionary evidentiary rulings will give rise to reversible error only where 'a substantial right of the party is affected.'" *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 228 (3d Cir. 2008) (cleaned up). We will affirm an erroneous evidentiary ruling "only if it is highly probable that the error[] did not affect the outcome of the case." *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 917 (3d Cir. 1985).

Here, Cetrulo's and Storm's testimony about the definitions of income, audit, or reconciliation did not prejudice Sponaugle. As we have already discussed, Cetrulo and Storm provided these definitions when describing the services their firm rendered to Sponaugle and AAW; and functionally, their definitions merely helped to establish that Sponaugle did not report anything other than her salary to Cetrulo when he prepared her tax returns, and that Stephano Slack did not review AAWs credit card statements. Moreover, the vast majority of the accountants' testimony was purely factual. So even if the accountants' purportedly expert testimony were stricken from the record, the remaining testimony establishes that Sponaugle had unsupervised access to AAW's credit card statements and used her AAW credit card to make unauthorized personal purchases. *See United States v. White*, 492 F.3d 380, 403–04 (6th Cir. 2007) (preserving proper lay witness testimony while striking improper expert testimony). Finally, the Government offered testimony from other witnesses to establish Sponaugle's scheme to defraud AAW. Agent Wilson, whose testimony is unchallenged, introduced into evidence the financial documents and company records about which Hoffman testified, provided a brief description of QuickBooks's functionality, and described the Government's

13

investigation.  And McCracken identified specific, unauthorized purchases that Sponaugle made.  Because Sponaugle was not prejudiced by Cetrulo's, Storm's, and Hoffman's predominantly fact testimony, and because of the significant, independent evidence of her guilt, we will affirm.

B.

Next, Sponaugle urges that the District Court abused its discretion by granting the Government's motion *in limine* to introduce her tax records as intrinsic evidence of wire fraud, or, in the alternative, as evidence of Sponaugle's knowledge and intent under Rule 404(b).  We disagree.

Intrinsic evidence is evidence that either directly proves the charged offense or "uncharged acts performed contemporaneously with the charged crime . . . [that] facilitate the commission of the charged crime."  *United States v. Green*, 617 F.3d 233, 248–49 (3d Cir. 2010) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).  "[T]he nature and scope of the evidence able to be deemed intrinsic will vary with the charged offense."  *United States v. Williams*, 974 F.3d 320, 357 (3d Cir. 2020).  Because intrinsic evidence is directly related to the crimes charged, it need not be evaluated under Rule 404(b).  *Green*, 617 F.3d at 240–41.

Extrinsic evidence may be admitted under Rule 404(b) if it is "(1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested."  *United States v. Caldwell*, 760 F.3d 267, 277–78 (3d

Cir. 2014).

Here, the District Court did not abuse its discretion in admitting Sponaugle's tax returns as intrinsic, direct evidence of wire fraud. The Government sought to admit Sponaugle's tax returns because her failure to claim the additional "income" she received in the form of her personal, unauthorized purchases could support the inference that she acted with knowledge or intent to commit wire fraud. Indeed, its omission from her tax returns could have reflected her knowledge that such income was illegitimate or that she tried to conceal her scheme to defraud AAW. And this evidence directly helps to prove wire fraud because the Government needed to establish that Sponaugle acted with the intent to defraud. 18 U.S.C. § 1343; *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) (explaining that intent to defraud can be established through circumstantial evidence and inferences).

Although we hold that the tax returns were intrinsic evidence of Sponaugle's wire fraud, the District Court did not abuse its discretion in admitting Sponaugle's tax returns on an alternate, Rule 404(b) basis. As the District Court explained, the Government presented Sponaugle's tax returns for a proper, non-propensity purpose—to demonstrate her intent and knowledge of the crime or her possible efforts to conceal her criminal acts—and that the documents were relevant to and probative of that non-propensity purpose. The District Court concluded that any prejudice or juror confusion was outweighed by the tax returns' probative value, and offered to give a limiting instruction, which it later did at trial.

C.

15

Lastly, Sponaugle contends that the District Court abused its discretion by precluding her from cross-examining McCracken about her efforts to amend her deposition testimony in an unrelated Delaware Superior Court proceeding. Although the District Court precluded this evidence under Rule 403, Sponaugle now argues that this evidence was admissible under Rule 608(b).[4] Because Sponaugle failed to present any argument that the District Court erred under Rule 403, she has waived any challenge to this evidentiary ruling. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017) ("As a general matter, an appellant waives an argument in support of reversal if it is not raised in the opening brief." (citing *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 241 (3d Cir. 2012)). Nevertheless, we find that the District Court did not abuse its discretion in doing so, nor would it have abused its discretion had it precluded the evidence under Rule 608(b).

A trial court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We give "substantial deference" to a court's Rule 403 determinations. *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999).

Here, the District Court found that the Superior Court's decision to strike McCracken's errata sheet had "close to zero . . . probative value" because "the fairest

---

[4] We note, however, that Sponaugle's counsel conceded at the pretrial conference that Rule 403 served as an independent basis to preclude this evidence regardless of its admissibility under Rule 608(b).

reading" of the opinion showed that the state court's decision was "entirely unaffected" by any views about McCracken's truthfulness. App. 345. Moreover, the District Court emphasized the reasonable likelihood that McCracken relied on her attorney's strategic advice when submitting the errata sheet, further reducing its probative value respecting her truthfulness. The District Court noted that the near-nonexistent probative value of the errata sheet was substantially outweighed by the high risk of prejudice to the Government's case, potential juror confusion caused by distinctions between civil and criminal matters and depositions and trial testimony, and wasted time delving into the medical malpractice case, deposition testimony, and state law rules respecting the submission of errata sheets.

Although the District Court did not premise its evidentiary ruling on Rule 608(b), the record reflects that it would not have abused its discretion in doing so. Rule 608(b) allows prior acts to "be inquired into on cross-examination, at the discretion of the court, if they are probative of a witness's truthfulness or untruthfulness." *United States v. Davis*, 183 F.3d 231, 257 (3d Cir. 1999). As we have previously discussed, when the District Court conducted its Rule 403 analysis, it found that McCracken's efforts to alter her deposition testimony were not probative of her truthfulness.

### III.

For the foregoing reasons, we will affirm the District Court's judgment of sentence.